Barry Kirschner Law, LLC
2205 E. Speedway Blvd.
Tucson, AZ 85719
520-849-7771
Fax 520-849-7773
Barry Kirschner/SBN 005592/PAN 31284
Barry@BarryKirschnerLaw.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Luis Monroy, | |
| Plaintiff, | D.C. No. |
| vs. | **COMPLAINT** |
| The Lincoln National Life Insurance Company, | |
| Defendant. | |

Plaintiff Luis Monroy ("Monroy") alleges:

1.      This dispute is within the jurisdiction of the United States District Court for the District of Arizona.  29 U.S.C. §1132 (a)(1)(B) and (a)(3). Venue is proper.

2.      Monroy was a long term employee of the Jim Click Auto Group (JCAG) and a participant in the group insurance contract sponsored by TCAG, for long term disability benefits.

3.      Defendant The Lincoln National Insurance Company (Lincoln) is an insurer which makes itself available to insure, and to administer Policies of insurance and claims for Plans, including within Arizona and plans governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1101 et seq. The same Lincoln is the insurer of the Group Short Term Disability Plan for Employees of TCAG, Inc. (LTD Plan)

Complaint - 1

4.     The relevant insurance group disability protection in which Monroy is a participant is part of a contract between the Plan and Lincoln to provide benefits to employees such as Monroy.  The Plan is within the scope of ERISA.

5.     The purpose of Congress in enacting the Employee Retirement Income Security Act (ERISA) is described in 29 U.S.C. §1001(b):

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
> 29 U.S.C. §1001(b).

6.     All procedures which must be exhausted prior to bringing this civil action have been exhausted.  This claim is ripe for decision by the United States District Court.

7.     Lincoln owes a fiduciary duty to its Plan participants including Monroy.

8.     Lincoln has acted with bias in not providing a full and fair review of Monroy's claims for disability benefits, and related appeals.

9.     Lincoln has a structural conflicted interest because if it uses its fiduciary power to terminate or deny payment of the benefits Lincoln is rewarded by keeping the money that would be due to its beneficiary.

10.     The *situs* state language for California applies for the relevant LTD contract as indicated in the Defendant's claims log which also notes that Arizona state language is not applicable. *See* Exhibit 1.

11.     Monroy would be eligible to receive benefits from the LTD contract for disability through June 11, 2036.

**MONROY AND HIS OCCUPATION**

12.     Monroy was an Automobile-Repair Service Estimator (Estimator) from April 1995 until his disability in 2017 for the Jim Click Auto Group (JCAG).

13.     Monroy's occupation required occasional stooping, kneeling, crouching, frequent reaching, and handling.

14.     Monroy's regular occupation, and the ability to perform all responsibilities well, were critical to efficient administration of quality customer service for his employer.

15.     Monroy's substantial and material duties included a combination of activities which are inconsistent with conditions which have afflicted Monroy before and after his last day of work.

16.     After becoming aware of Monroy's symptoms and medical limitations, his employer advised Defendant Lincoln of the physical requirements of the Estimator occupation. These include:

> 10.  Works in an out-of-doors environment during daytime and night time hours and in a variety of weather conditions and temperatures, environment is generally dusty and filled with vehicle exhaust.
> 11.  Works with more than one person and/or task simultaneously, maintaining a cordial and friendly manner at all times.
> 12.  Extensive (up to 8 consecutive hours) standing and walking (up to 5 miles daily) on cement, unusual parking lot surfaces, tile, lino and other interior and exterior flooring surfaces.
> 13.   *Repeated, regular and extended sliding, twisting, bending, pulling, pushing, stooping, stretching and reaching.*
> 14.  Repeated and regular getting in and out of different sized vehicles.
> 15.   Repeated lifting of vehicle hoods and trunks (up to 40 pounds leveraged).
> …
> 17.  All physical requirements detailed on attached chart. (Italics emphasis added).

17.     The chart to which the previous paragraph refers includes classifications of what is required on a never, occasional, frequent, or constant basis.

18.     The chart describes a job requirement that the employee be able on a frequent basis to twist at the neck and on an occasional basis to twist at the waist. Frequent is defined as for 3-6 hours on a daily basis. Occasional is defined as up to 3 hours on a daily basis.

19.     Monroy tried to work for years while his physical condition deteriorated from medical ailments.

20.     Monroy's employer Jim Click accommodated him as much as possible to allow Monroy to stay employed in spite of functional inability to perform some parts of his regular occupation.

21.     Monroy's attempts to continue working while in deteriorating health and capacity are reflected in the unusual income trend for a man his age. Monroy's Medicare earnings for 2016, his last full year of employment, total $47,574. Monroy's Medicare earnings for 2015 were $59,103. This reflects a drop of income greater than 33% from his 2014 Medicare earnings of $71,185.

22.     From 2010-2014 Monroy's income averaged close to $70,000 with his lowest annual earnings in 2013 being $67,406. From 2020-2016 his annual income was:

| | |
|---|---|
| 2017 | $9,065 |
| 2016 | $47,574 |
| 2015 | $59,103 |
| 2014 | $71,185 |
| 2013 | $67,406 |
| 2012 | $70,472 |
| 2011 | $70,605 |
| 2010 | $70,358 |

**MONROY'S MEDICAL AILMENTS**

23.     Monroy has medical problems including severe low back pains that have worsened during the last decade.

24.     Monroy attempted to obtain relief from his spinal pain with laminectomy and foraminotomies, laser surgeries, in June 2015.

25.     An MRI was performed on the lumbar spine July 17, 2015, and Dr. Sipos noted numbness and tingling, and occasional pain in the right foot, and that pain in Monroy's back varied in type, severity, and location.

26.     On July 8, 2015, Tucson neurosurgeon Eric Sipos described Monroy's condition and recent surgical history as increasing the likelihood of rotational instability and back pain which would be hard to see on X-ray.

27.     Monroy again attempted to gain relief with spinal surgery in August 2015.

28.     Monroy underwent a L4-L5 lumbar fusion on or about December 2015 to attempt to relieve his severe low back pains.

29.     On January 5, 2017, Monroy underwent a posterior nerve block testing. After the procedure, Monroy developed a myofascial pain exacerbation and Dr. Cornidez documented the presence of severe lumbar muscle spasms.

30.     As of January 2017, Monroy's prescribed medications included Naproxen 250 mg, Acetaminophen-Oxycodone 325 mg-5 mg, Cyclobenzaprine 5 mg, Diazepam 2 mg, Lisinopril 5 mg, Gabapentin 300 mg, Piroxicam 20 mg.

31.     A May 15, 2017 MRI report found a disc bulge at L3-L4, which combined with facet degeneration contributes to a mild right lateral recess narrowing and slight canal narrowing.

32.     A May 30, 2017 Pain Clinic examination found multiple myofascial trigger points when palpated on Monroy's shoulder. A diagnosis of Myofascial Pain Syndrome was made on the basis of objective evidence.

33.     On October 27, 2017, Monroy sought help from Tucson pain management specialist Dr. Eric Cornidez who diagnosed 1) Post Laminectomy Syndrome; 2) Lumbar Disc Degeneration; 3) Lumbar Spondylosis; 4) Myofascial Pain Syndrome; 5) Chronic Pain Syndrome; and found elements of Reflex Sympathetic Dystrophy (RSD) now frequently referred to as Complex Regional Pain Syndrome.

34.     By November 28, 2017, the pain was so severe that Dr. Sipos discussed the possibility of implanting a spinal cord stimulator in Monroy.

35.     Medical reviewer Thomas Luna was hired by Defendant to review the December 2017 disability benefits appeal of Monroy. Luna issued his January 18, 2018 report under the letterhead of Professional Disability Associates (PDA) to Lincoln. On information and belief PDA is a for profit company providing medical opinions or peer reviews to disability insurance companies.

36.     The Luna report referenced a January 12, 2018 telephone call with Dr. Valerie Wohl, Monroy's primary care provider (PCP). Wohl stated an unambiguous opinion that Monroy was unable to work. Luna described Dr. Wohl's statement in part:

> You told me that at least two or three days a week Mr Monroy has so much pain that his mobility is severely affected. At such times he is unable to walk or get out of bed. It is quite unpredictable when these days will occur. On other days, he continues to have significant pain but he has full mobility and could possibly work. You believe that the unpredictability of Mr. Monroy's immobility renders him unable to work.

The opinion by Dr. Wohl that Monroy could not return to work was consistent with her opinions expressed in May 2017, January 2017, and since that time.

37.     Luna's January 2018 report concurs that the patient suffers back pain which is axial or radicular and states:

> Mr. Monroy appears to have significant pain on a daily basis with periodic exacerbations and mild to moderate control with medications, acupuncture and exercise. Apart from his pain, he does not appear to have any physical functional limitations except when he has associated back spasm. Back spasms and associated reduced spinal range of motion are credibly associated with spondylosis/axial back pain. The frequency of his back spasms is not described in the documents available for my review but they were present in only a small minority of the clinical encounters provided to me. Clinical notes were consistent in documenting normal strength and sensation…
> It is credible that Mr. Monroy had difficulty getting out of bed and dressing during periods when he had spasm. [Emphasis added].

38.     Luna's report also stated:

> It is credible that Mr. Monroy could have difficulty driving due to the sedating effects of his pain medications, but it is unclear if or how

often Mr. Monroy has been unable to drive. <u>His family medicine provider in Jan 2017 noted that he was unable to drive a car when taking his pain medicines.</u> Mr. Monroy mentioned this also in a letter to Lincoln Financial in Apr 2017. [Emphasis added]

39.    Luna also concluded that Monroy required restrictions in his work to not encourage worsening his condition.

Lifting/carrying, pushing/pulling, twisting and stooping can trigger back spasm and worsen pain for individuals with axial back pain. Some level of restriction on these activities would be appropriate for Mr Monroy. Within the limitations of the documentation available to me, I would recommend restriction from twisting and stooping (never). I would recommend restriction from pushing, pulling, lifting or carrying over 40 pounds (never). This would be reduced to 10 pounds during times of pain exacerbation. His work station should provide him with the ability to work from either a standing or seated position and to easily transition from one to another. He should be given the opportunity to walk for at least 3 minutes in every 30.

40.    Medical reviewer Luna was again chosen to review further documentation provided by Monroy for an addendum to assist Lincoln in denying the appeal of Monroy.

41.    Luna's conclusion from his March 2, 2018 report addendum is:

My prior opinion does not change based on the new information. Mr. Monroy has significant pain but he does not appear to have any physical functional limitation. Work restrictions are recommended for his spondylosis/axial back pain, as previously described.

42.    Luna's philosophy did not consider pain disabling, or the physical inability to be mobile on a reliable basis to interfere with Monroy's ability to perform the physical requirements of his occupation with reasonable continuity.

43.    Monroy suffered a non-union of his spine following his 2015 fusion surgery.

44.    Although not definitively established until yet another surgery in October 2018, a source of incapacitating pain and muscle spasms in Monroy was the "non-union" following his previous L4-5 fusion that was performed in December 2015.

45.    Relevant parts of the 2015 surgery are described by Arizona Board certified anesthesiology trained Dr. Gretchen Van Maren. <u>Exhibit 2,</u> Van Maren Statement.

46.     Van Maren Statement explained the clinical consistency of January 2017 and later with the non-union verified by the October 2018 surgery:

> Mr. Monroy's clinical symptoms from January 2017-October 2018 are exactly what doctors would expect a patient suffering from an L4-5 non-union would experience. This correlation provides highly authoritative objective evidence of Mr. Monroy's continuing disability in this case. He had severe and credible back pain, as well as pain from inflamed and strained ligaments, tendons and discs. He had severe nerve pain (sciatica) traveling down his legs from spinal nerve roots being pinched and/or stretched by the non-union. He had severe lumbar muscle spasms from his body's attempt to fix itself. The severity of his pain is corroborated by statements of lay witnesses, his employment history, and by his treating physicians. The more active that Mr. Monroy tried to be by returning to work, the more severe his symptoms became. Had Mr. Monroy continued to work following his first spinal fusion, it is very likely that he would have suffered extensive damage to his spine and his symptoms of pain, spasms, numbness and weakness would have been exacerbated. (Van Maren Statement.)

47.     The surgery performed in December 2015 was the origin of the non-union difficulties as described in the Van Maren Statement.

48.     Monroy's February 5, 2018 office visit to Dr. Christiano documents a marked antalgic gait and abnormal body posture. Monroy's abnormal body posture is the result of severe lumbar paraspinal and quadratus muscle spasms.

49.     Persistent reports of severe back pain led Tucson orthopedic surgeon Dr. Stephen Curtin to suspect that Monroy had a non-union of his spine. In June 2018 Monroy was asked whether he would undergo another spinal surgery to determine whether this had occurred. At that time, Monroy declined the highly invasive fusion surgery.

50.     The non-union was not proven until Dr. Curtin performed additional major spinal surgery in October 2018. Dr. Van Maren describes this as a "moment of clarity" (Van Maren Statement).

51.     Extreme pain persisted. Monroy underwent surgery with Dr. Curtin October 2, 2018. The surgery established without doubt that Curtin's suspicion that there had been a non-union was correct.

52.     The Van Maren report identified Monroy's records as "replete with clinically established evidence that demonstrate multiple causes of severe back pain, leg pain, and lumbar muscle spasm."

53.     Specifically, an April 19, 2019 MRI of Monroy's spine established objective evidence contradicting Schumacher. Van Maren summarized the significant MRI findings in her report.

I summarize the MRI findings as follows:
1. There is an entirely new (since the October 2018 surgery) L2-3 disc herniation that is causing compressions of the left L3 spinal nerve root. This new finding would be expected to cause back pain, left leg, thigh and hip pain, and muscle spasm.
2. There are new changes (since the October 2018 surgery) at L4 suggestive of a Schmorl's node. This is a potentially painful bone erosion of the L4 vertebral body.
3. Other degenerative, painful changes were present before Monroy's October 2018 surgery and they continue to be present now. These include two other herniated discs with nerve compression at L3-4 and L5-S1. The moderate foraminal narrowing and nerve compression at L4-5 persists. There is facet degenerative joint disease present. There is mild spinal canal narrowing at L3-4 due to a herniated disc.
4. Despite Dr. Schumacher's belief that there is no objective evidence to explain Mr. Monroy's experience of severe pain, this most recent MRI demonstrates that there are actually many reasons for Mr. Monroy to be experiencing persistent, severe pain. Widespread lumbar degenerative disc disease and nerve compression will cause severe pain, especially with activities such as extended sitting, bending, crawling and lifting. These activities should be sharply limited for Mr. Monroy. Van Maren Statement.

54.     Monroy's PCP have continually supported his claim for disability for all relevant times.

55.     Primary Care Physician Valerie Wohl has completely supported limitations and restrictions preventing Monroy from working since January 2017 with notes including January 24, 2017, a limitation which included no lifting.

56.     Wohl's office note of May 12, 2017 evidences a severity level for Monroy's pain which was incapacitating, including positive for tingling in the legs and back pain. Wohl's May 18, 2017 letter further supports the Monroy disability claim.

57.     Dr. Wohl expressed her opinion to Defendant's medical reviewing physician Luna as described in his January 18, 2018 report that Monroy was unable to work for reasons including unpredictability of when his pain would prevent him from appearing. Wohl reported that at least 3 times per week that Monroy's mobility was severely affected by his pain.

58.     In June 2018, Monroy's office visit to Wohl was memorialized with her Assessment which included 1) Myofascial pain dysfunction syndrome; 2) lumbar degenerative disc disease; 3) Lumbosacral spondylosis without myelopathy; 4) lumbar postlaminectomy syndrome; and 5) Chronic pain disorder.

59.     Wohl complied with Lincoln's request to fill out an Attending Physician's Statement. Wohl's June 22, 2018 Statement included that Monroy was able to walk 30 minutes on a "good day" and that there were days each week with severe pain when he is unable to ambulate or get out of bed which would interfere with his ability to get (or hold) a job.

60.     Lincoln assigned the LTD claim analysis to Philip Stegmaier, RN, BSN, MPH. Stegmaier wrote in an internal email not shared with Monroy that he did <u>not</u> anticipate Monroy could regain his prior capacity due to the limiting effects of the fusion.

61.     On or about September 6, 2018, Lincoln's file reflects:

> Conclusion: The claimant's restrictions, as noted above, are not consistent with the claimant's own occupation of Automobile-Repair-Service Estimator (DOT 620.261-018, Light occupation), as the occupation requires occasional stooping.

62.     Lincoln Nurse employee Stegmaier commented that PCP Wohl had appropriately suggested Monroy restrict standing and walking to no more than 15 minutes without a break to sit down. He noted that Wohl agreed to Dr. Luna's recommendation restricting bending, stooping, twisting, and overhead reaching.

63.     On August 28, 2018, Stegmaier noted: "Based on the evidence available for review, claimant has reached maximum medical improvement with regards to his chronic low back pain and no further improvement is anticipated."

64.     Lincoln was aware in August 2018 that orthopedic surgeon Curtin had suggested a diagnostic discography which is a painful exploratory procedure to determine if Monroy had a non-union of his surgical fusion.

65.     After October 2018 when the non-union in Monroy's spine was confirmed by a new spinal fusion, Lincoln used reviewers (Schumacher and Swamy) who discounted or ignored the significance of the non-union. These Lincoln reviewers, contrary to mountains of medical facts, gave Lincoln the opinion which it sought that there was no objective evidence to support Monroy's claim of debilitating pain.

66.     Monroy added to his treating medical providers a pain management specialist. The October 27, 2017 notes of Dr. Eric Cornidez list impressions of post laminectomy syndrome lumbar, lumbar degenerative disc disease; lumbar spondylitis and chronic pain syndrome. Cornidez noted "I do believe that his pain is multifactorial in etiology, that does involve the SI joint, facet joints, discs, granulation tissue, myofascial, and even some element of RSD."

**MEDICATIONS PRESCRIBED BY TREATING PHYSICIANS AND EXPECTED SIDE EFFECTS**

67.     Monroy's primary care physician Valerie Wohl, in her January 2017 Attending Physician's Statement, completely limited Monroy from work due to his back pain. Wohl also noted that his pain medications impeded his cognitive functioning.

68.     The number and character of the medications prescribed and taken by Monroy as of the date of the Schumacher IME are described in Dr. Van Maren's Statement, which reads:

> The occupational effects from the numerous medications required by Mr. Monroy is significant. According to Dr. Schumacher's exam, Mr. Monroy currently has these prescribed medications: Baclofen (a Valium-like medication used to alleviate muscle spasm), Oxycodone (narcotic for pain), Trazadone (anti-depressant used for sleep because of its profound sedating effects), Gabapentin (very sedating, anti-seizure medication used to alleviate nerve pain), Methocarbamol (very sedating muscle relaxant), Celebrex (anti-inflammatory), and numerous over the counter medications. These medications each cause fatigue and sedation on their own, and they also act in a synergistic manner, intensifying a patient's sedation, fatigue and fogginess. It should be noted that Mr. Monroy requires a relatively large dose of each of these medications.

69.     Monroy's appeal had produced evidence including from Marcy Tigerman, a Tucson occupational and rehabilitation specialist that Monroy's prescription medications "…And the side effects of the medications he takes in order to control his pain render him drowsy and sedated most of the time. *See* Exhibit 3, 2/13/19 Tigerman report at page 3.


**DEFENDANTS HAVE USED AN ARBITRARY AND INAPPROPRIATE STANDARD OF REVIEW IN TERMINATING MONROY'S STD AND LTD BENEFITS**

70.     By letter dated March 19, 2018, Defendants denied the final appeal of Monroy to have his STD benefit reinstated.

71.     The letter gave no weight to the findings of Monroy's treating PCP.

72.     Nowhere in the Policy definitions of the relevant Plan is there a requirement that the medical ailment causing disabling symptoms needs to have symptoms measurable as if a laboratory numerical analysis or a radiology image finding were necessary.

73.   The adoption of Luna's conclusion included factual misinformation, and an abandonment of the relevant standard of own occupation disability.

74.   Among the ways in which Lincoln abused its discretion in terminating Monroe's claim and denying his appeal, is by ignoring, the essential Job Functions performed in Monroy's own occupation which include, as stated by his employer Click:

> 10.   Works in an out-of-doors environment during daytime and night time hours and in a variety of weather conditions and temperatures, environment is generally dusty and filled with vehicle exhaust.
> …
> 12.   <u>Extensive</u> (up to 8 consecutive hours) standing and walking (up to _5_ miles daily) on cement, unusual parking lot surfaces, tile, lino and other interior and exterior flooring surfaces.
> 13.   **Repeated, regular and extended sliding, twisting, bending, pulling, pushing, stooping, stretching and reaching.**
> 14.   Repeated and regular getting in and out of different sized vehicles.
> 15.   Repeated lifting of vehicle hoods and trunks (up to 40 pounds leveraged).
> …
> 17.   **All physical requirements detailed on attached chart.** [Emphasis added].

75.   While rejecting the assessment of Monroy's treating physician Lincoln chose not to compare the restrictions noted as reasonable in the body of the Luna review and the description from the employer on the requirements of the occupation. Luna's January 18 report specifically states that Monroy should be restricted and should never twist or stoop on the job.

> <u>For the period 9/16/16 onward, I would recommend restriction from twisting and stooping (never). I would recommend restriction from pushing, pulling, lifting or carrying over 40 pounds (never). This would be reduced to 10 pounds during times of pain exacerbation.</u> His work station should provide him with the ability to work from either a standing or seated position and to easily transition from one to another. He should be given the opportunity to walk for at least 3

minutes in every 30. Note that I did not see any recommendations for work restrictions from any of his providers prior to Jan 2017 when he removed himself from work, but Mr. Monroy had spondylosis/axial back pain throughout this period. <u>Lifting/carrying, pushing/pulling, twisting and stooping can trigger back spasm and worsen pain for individuals with axial back pain. Some level of restriction on these activities is appropriate.</u> [Emphasis added].

76.     The chart establishing the job requirements of the relevant occupation also required lifting and carrying as much as 75 pounds occasionally, up to 3 hours per day, and 11-25 pounds frequently, as much as 3-6 hours per day. Luna's recommendations limit Monroy from pushing, pulling, lifting or carrying over 40 Pounds, stating that it is not medically reasonable to allow that at all.  The medical reviewer states Monroy should never be required to do any of these activities where the weight exceeds 40 pounds.

77.     Defendant's own doctor described the necessity of physical limitation for Monroy which is inconsistent with being able to perform the physical needs of his regular occupation.

78.     The difficulty of measurement of diseases including pain has been the subject of discussion by the United States Court of Appeals where the consensus is that it is not legitimate to require an unprovable quality of evidence to prove a measurement of pain or discomfort from the disease.  E.g., *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676-678 (9th Cir. 2011).

**MONROY'S CHRONIC AILMENTS HAVE ADDED TO THE SEVERITY OF HIS PAIN AND FUNCTIONAL DISABILITY**

79.     The length of time Monroy has suffered intractable low back pain and his four spinal surgeries (as of October 2018) are consistent with a chronic pain which can add a psychological impediment created by the chronic nature of the physical pain.

80.     Dr. Cornidez, Tucson pain medicine specialist, documented February 16, 2017 that following severe lumbar spine pain Monroy had become consumed by his pain

and unable to focus to the point where he asked Monroy to consult with a psychologist or psychiatrist.  (CF 403)

81.    On November 20, 2019 Monroy was seen by clinical psychologist Steven Marrinson at Medical Recovery Consultants (MRC).  Monroy's medical note states:

> Focus today was on reviewing the patient's ability to pace his daily activity in order to avoid unnecessary pain flare-ups caused by overactivity. On the basis of in-depth interview, it was determined that he has excellent behavioral adjustment to his severe pain and limitations. Unfortunately for this patient, he continues to be in severe pain on a daily basis despite his medication pain management and doing everything within his power to avoid unnecessary pain flare-ups. On this basis he was informed that it appears unlikely we can significantly reduce his level of pain through behavioral pain management.

82.    Steven Marrinson's 12-05-19 medical note states:

> Patient is having episodes of severe anxiety lasting an average of several hours. These are in reaction to pain flare-ups in his back and legs. He became tearful when describing these episodes. His face was flushed, and he appeared to be having rapid heartbeat as if simply having to focus on remembering the episodes triggered severe anxiety while describing the episodes.
>
> Training in anxiety management /Self-hypnosis was initiated with goal of reducing intensity and duration of his above described anxiety episodes. He was directed to focus attention on pressure in his hands equal to moderate stress level during office visit, then taught how to sustain mindfulness and keeping the hand pressure just above that moderate stress level. He was able to reduce stress level in half this way. He was given instructions to practice those three times daily.

**DEFENDANTS CONTINUE TO USE ARBITRARY MEDICAL REVIEWERS INSTEAD OF PROVIDING THE LEGALLY REQUIRED FULL AND FAIR EVALUATION TO MONROY**

83.    Extreme pain persisted. Monroy underwent surgery with Dr. Curtin October 2, 2018. The surgery established without doubt that Curtin's suspicion that there had been a non-union in the spine was correct.

84.     Rather than accept the new evidence which was unequivocal that Monroy had suffered from a non-union of his spine, Defendant sent him to an independent medical examination (IME) with Raymond Schumacher.

85.     Schumacher concluded in his April 9, 2019 report that Monroy was not disabled. For philosophical reasons he concluded that the multiple treating doctors who believed that he was disabled were doing a dis-service to Monroy and patients like him.

> Many statements about activity restriction have been made by this man's primary care providers in the medical records that are available to me. Those statements likely represent philosophical differences between myself and those physicians. It is customary in primary care medical practice to restrict according to reported symptomatic intolerances. I do not agree with that approach. (Schumacher IME, April 9, 2019, page 8). [Emphasis added]

86.     Monroy's appeal had produced evidence including from Marcy Tigerman, a Tucson occupational and rehabilitation specialist that Monroy's prescription medications and "…the side effects of the medications he takes in order to control his pain render him drowsy and sedated most of the time. See Exhibit 3, 2/13/19 Tigerman report at page 3.

87.     The report of Tucson occupational expert Marcy Tigerman Provides further reasons why Monroy was unable to be re-employed because his medical ailments make him unreliable.

88.     Tigerman noted that the medical reviewers hired by Defendant ignored the key component of employment sustainability. Tigerman's assessment was that Monroy is rendered incapable of employment in any occupation due to the unrelenting nature of chronic pain which makes him unreliable in terms of performance.

89.     Tigerman's report reflects common sense, nowhere addressed and rebutted by Lincoln or its multiple medical reviewers. Tigerman writes:

> One of the essential functions of Mr. Monroy's job, according to CF-00187 is arriving on time as scheduled with consistent, regular and timely attendance. According to both Drs. Wohl and Pereira, Mr.

Monroy's condition did result in lost time from work. This renders him unable to fulfill one of the essential functions of the job not even associated with physical requirements. *See* Tigerman report at page 10.

90.   The diminishing income pattern of Monroy from 2014-2017 reflects an employer who tried to work with Monroy and keep him at work, even though the number of hours he was able to work had become lower than standard.

91.   Medical evidence through the relevant time period reflect a significant number of days, where Monroy is physically unable to get out of bed because of the pain. None of the reviewing physicians address the fundamental proposition that if you cannot reliably show up at work you cannot perform with the continuity needed to sustain a job.

92.   Paid medical reviewers including the two most recent disregard the Tigerman findings and discussions about reliability and side effects of the powerful medicine taken by Monroy, prescribed by multiple treating physicians. Schumacher ignores the effects of these prescription medicines by essentially second guessing all prescribing doctors, treating doctors who attempt to improve Monroy's condition and mitigate his pain. Reviewer Swamy ignores the issue entirely.

93.   Defendant appears to bypass all occupational analysis by ignoring the actual requirements of the work Monroy performed, and simply classifying it as "light." Tigerman points out that confusion in the "heavy duty" nature of aspects of the occupation are all swept away by Defendant. The job classification noted in the *Dictionary of Occupational Titles* by the Department of Labor is "Heavy." *See* Tigerman report at page 9.

94.   Schumacher considered whether Monroy's evidence that the level of prescribed medication would by itself be disabling from a responsible position requiring energy and ability to focus with continuity for an entire 8 hour day. Schumacher's report at page 7 states (toward the bottom):

I find in Ms. Tigerman's analysis mention of sedating properties of medications. However medication use by this man is inherently discretionary on his part, and cannot be regarded as medically

1

necessary on a medical scientific basis, because the medications are
used to treat his own symptoms.

2

3       95.    In other words, Schumacher, based on his one-hour examination of

4    Monroy, disagreed with the treatment provided by multiple treating physicians and

5    declared that the medications they prescribed were unnecessary and that Monroy should

     not follow their advice.

6

7       96.    On information and belief, Defendant was aware of Schumacher's

8    philosophy and prefers a reviewing doctor who states: "It is customary in primary care

9    medical practice to restrict according to reported symptomatic intolerances." In short,

10   Lincoln agreed to hire Schumacher to give an outsider's opinion knowing that he was

11   philosophically opposed to the more sensitive patient-oriented practices of those who

     actually treat patients as primary care providers.

12

13      97.    Schumacher failed to contradict Tigerman that the effects of the

14   combination of medications lawfully prescribed by treating physicians with prescriptions

15   would be disabling. Instead, Schumacher declared all of the medications, prescribed over

     years by treating physicians, were unneeded.

16

17      98.    The Schumacher report was contradicted by multiple medical records from

18   April 2019 and an expert report from Board certified anesthesiologist Van Maren. See

     Van Maren Statement attached as Exhibit 2.

19

20      99.    The number and character of the medications prescribed and taken by

21   Monroy as of the date of the Schumacher IME are described in Dr. Van Maren's

     Statement, which reads:

22
              The occupational effects from the numerous medications required by
23            Mr. Monroy is significant. According to Dr. Schumacher's exam, Mr.
              Monroy currently has these prescribed medications: Baclofen (a
24            Valium-like medication used to alleviate muscle spasm), Oxycodone
              (narcotic for pain), Trazadone (anti-depressant used for sleep because
25            of its profound sedating effects), Gabapentin (very sedating, anti-
              seizure medication used to alleviate nerve pain), Methocarbamol
26            (very sedating muscle relaxant), Celebrex (anti-inflammatory), and
              numerous over the counter medications. These medications each
27            cause fatigue and sedation on their own, and they also act in a

28

synergistic manner, intensifying a patient's sedation, fatigue and fogginess. It should be noted that Mr. Monroy requires a relatively large dose of each of these medications.

100.    The report of Tucson occupational expert Marcy Tigerman provides further reasons why Monroy was unable to be re-employed because his medical ailments make him unreliable.

101.    Tigerman noted that the medical reviewers hired by Defendant ignored the key component of employment sustainability. Tigerman's assessment was that Monroy is rendered incapable of employment in any occupation due to the unrelenting nature of chronic pain which makes him unreliable in terms of performance.

102.    Tigerman's report reflects common sense, nowhere addressed and rebutted by Lincoln or its multiple medical reviewers. Tigerman writes:

> One of the essential functions of Mr. Monroy's job, according to CF-00187 is arriving on time as scheduled with consistent, regular and timely attendance. According to both Drs. Wool and Perrier's, Mr. Monroy's condition did result in lost time from work. This renders him unable to fulfill one of the essential functions of the job not even associated with physical requirements.  Tigerman report at page 10

103.    The diminishing income pattern of Monroy from 2014-2017 reflects an employer who tried to work with Monroy and keep him at work, even though the number of hours he was able to work had become lower than standard.

104.    Medical evidence through the relevant time period reflect a significant number of days where Monroy is physically unable to get out of bed because of the pain. None of the reviewing physicians address the fundamental proposition that if you cannot reliably show up at work you cannot perform with the continuity needed to sustain a job.

105.    Paid medical reviewers including the two most recent disregard the Tigerman findings and discussions about reliability and side effects of the powerful medicine taken by Monroy, prescribed by multiple treating physicians.  Schumacher ignores the effects of these prescription medicine by essentially second guessing all prescribing doctors, treating doctors who attempt to improve Monroy's condition and mitigate his pain.  Swamy ignores the issue entirely.

106.    Defendant appears to bypass all occupational analysis by ignoring the actual requirements of the work Monroy performed, and simply classifying it as "light". Tigerman points out that confusion in the "heavy duty" nature of aspects of the occupation are all swept away by Defendant. The job classification noted in the Dictionary of Occupational Titles by the Department of Labor is "Heavy".  *See* Exhibit 3, Tigerman report at page 9.

107.    Still looking for a way to deny Monroy's LTD claim, Defendant hired medical reviewer Priya Swamy who is licensed in Delaware and Pennsylvania.

108.    The Swamy report is full of errors. Swamy makes no mention of the findings of the surgery performed October 2, 2018 which concluded that Monroy has suffered from a non-union of his spine and it was necessary to replace existing hardware and entirely remove the L5 disc, insert a cage structure between L4 and L5 and remove all bone and connective tissue involved in the non-union.

109.    Surgeon Curtin in the major October 2018 procedure also discovered that the L4 nerve root was scarred down against the L5 nerve root and both roots were compressed.

110.    Curtin's surgery was not only complex, it explained why there had been such difficulties prior to the procedure to correct the non-union for the December 2015 surgery.

111.    The Swamy report states nothing about the non-union in Monroy's spine, and its effect on Monroy since the December 2015 surgery.

112.    The Swamy report inaccurately refers to May 3, 2019 "progress notes" from Dr. Gretchen Van Maren. Van Maren is not a treating physician, but an Arizona Board certified physician who studied Monroy's matter thoroughly and authored an extensive report.

113.    Van Maren and her work are never mentioned in the Swamy report other than the incorrect listing of her as creating a progress note.

114.   Although never mentioned by Swamy, the Defendant's January 6, 2020 decision in which it once again rejected Monroy's second and final LTD appeal stated this about Van Maren's analysis:

> The independent physician statement from Dr. Gretchen VanMaren [sic] dated 5/3/2019 stated that Mr. Monroy underwent a surgery in October 2018 to remove and replace the faulty hardware from his prior spinal fusion surgery. Dr. VanMaren indicated that following surgery the average recovery time is six to 12 months before full resumption of his prior physical activities and full time employment can be resumed. Dr. Van Maren indicated that there is still a question regarding possible non-union.

115.   The essence of the Van Maren opinions, that the non-unions explains much of what had been troubling Monroy's condition in 2017-2018 was ignored by Defendant.

116.   The essence of the Van Maren and the Tigerman opinions regarding disabling side effects of prescribed medicines were ignored by the Swamy report and Defendant.

117.   The Swamy report went on to state that "there are no objective signs of impairment" even though there were four major surgeries and treating doctors and surgeons who have tried to manage his pain with strong pharmaceutical support. Swamy argues that chronic pain exists but that with all the treatment Monroy has received that he should not hurt so much.

118.   In short, the Swamy report is devoid of logic with the exception that the medical reviewer knows what Defendant Lincoln wanted her to conclude, and she has followed the will of her payor.

**DEFENDANT HAS TAKEN ADVANTAGE OF MONROY WHILE HE WAS UNREPRESENTED TO DENY HIS LEGITIMATE CLAIM FOR SHORT TERM DISABILITY (STD) BENEFITS**

/ / /

**MONROY FILES FOR SHORT TERM DISABILITY BENEFITS**

119.   Monroy's claim for STD benefits was approved and benefits paid by Lincoln from February 15, 2017 until March 1, 2017. Defendant then terminated benefits effective March 2, 2017.   The initial approval was based on diagnoses and/or determinations of lumbosacral spondylitis with radiculopathy, chronic pain, and chronic use of opioids.

120.   Benefits ceased effective March 2, 2017 when Lincoln, without hiring a doctor for an independent medical exam, or even a medical doctor to review the file, terminated the claim based on the advice of a nurse consultant who found no abnormal objective findings or evidence of functional deficits.

121.   By a letter dated April 25, 2017, Lincoln denied STD benefits beyond March 1, 2017. Prior to being represented by counsel, Monroy timely appealed the termination of his STD benefits.

122.   Lincoln denied Monroy's appeal by letter dated June 20, 2017.  Lincoln's letter accepted the diagnosis of lumbosacral spondylosis with radiculopathy, chronic pain, and chronic continual use of opioids. It also stated: "While we acknowledge your reports of ongoing low back pain and understand that you would need to continue your pain medication and treatments; these treatments can be continued on an outpatient basis and scheduled around a fulltime work schedule, thereby avoiding missed time from work."

123.   Monroy again without counsel timely appealed to Lincoln on December 18, 2017. Monroy included supporting documentation from doctors Michael Maricic, Pereira, Sipos, Eric Cornidez, and Bejarano. This appeal was denied by a March 19, 2018 letter from Lincoln.

124.   Through all STD appeals, Lincoln never obtained a functional capacity evaluation ("FCE"), or paid for an independent medical examination ("IME").

/ / /

**MONROY FILES CIVIL ACTION**

125.     On July 12, 2018, Monroy filed a civil action stating that Defendant Lincoln had violated his rights by providing an incorrect Short Term Disability (STD) decision which lacked a full and fair evaluation.   This civil action shall be referred to as Monroy 1. *See* Document 1 Civil Case No.: 4:18-cv-00314-JAS.

126.     Lincoln filed its Answer September 20, 2018, to the Complaint in Monroy 1 denying almost all allegations.

127.     Lincoln alleged affirmative defenses including that Monroy 1 failed to state a claim; Monroy failed to exhaust administrative remedies; Monroy's July 2018 civil action for denial of benefits earlier in 2017 was not filed within the relevant statute of limitations; and that Lincoln may have other affirmative defense.

128.     Lincoln asked to be awarded attorney's fees from Monroy.

129.     Pursuant to Order of the Court, the parties in Monroy 1 filed a Joint Case Management Plan November 7, 2018. Lincoln refused to withdraw affirmative defenses which were frivolous, including for failure to exhaust administrative remedies and filing the action outside the Statute of Limitations.

130.     Lincoln was Ordered by the Court to provide and file its Administrative Record (AR) by November 30, 2018.

**LINCOLN AGREES TO PAY COMPLETE BENEFIT FOR STD PLUS ATTORNEY'S FEES**

131.     On November 20, 2018, Lincoln's counsel informed counsel for Monroy: "The STD benefits are going to be paid. Do you want Lincoln to make the check payable to you, your client, or jointly." Also, on November 20, 2018, Defendant's claim department sent a letter stating that Lincoln would pay the remaining possible benefits. Exhibit 4.

132. By a November 21, 2018 e-mail, Lincoln's counsel expressed her understanding that the STD benefits ran from March 1, 2017 to August 2, 2017 and Defendant would pay them.

133. By a November 27, 2018 e-mail, Lincoln's counsel asked for cooperation in extending the Court Ordered deadline that Lincoln file the AR with the Court by November 30. Lincoln advocated telling the court: "Very simply- just state that Lincoln will be paying the remainder of the STD benefits to Mr. Monroy and staying that filing deadline for filing administrative record and MIDP responses should be postponed . . . While the parties work through these issues."

134. A Joint Motion explaining the parties' positions was filed (Document 14) with the Court November 30, 2018.

135. A Stipulation filed with the Court in Monroy 1 (Document 18) advised the Court that the parties had agreed on amounts to be paid for attorney's fees and costs and that there was agreement that the STD civil action could be dismissed with prejudice.

136. In addition to paying the entirety of Monroy's STD benefits, Lincoln agreed to pay substantial attorney's fees to Monroy's counsel in consideration for not filing a Motion for Attorney's fees with the Court.

## COUNT 1
## DECLARATORY JUDGMENT

137. Monroy incorporates all paragraphs above as if fully set forth herein.

138. Lincoln has a financial conflict of interest which has influenced LTD decision making, and prior to that STD decision making, adverse to the interests of fairness and of Monroy and his legal rights as a claimant/participant.

139. Lincoln has breached its fiduciary duties by not performing in the interests of the participants and beneficiaries for the purpose of providing benefits to participants and their beneficiaries as required by ERISA, 29 U.S.C. § 1104(A)(1).

140.   Lincoln improperly denied the Monroy claims for benefits and denied his administrative appeals.

141.   Monroy seeks a declaration by this Court that:

   1.   Long Term Disability benefits be paid by Lincoln for the entire period beginning with Monroy's date of eligibility for benefits through the date of the court's judgement;

   2.   Monroy be awarded attorneys' fees, costs, pre-judgment interest in reasonable amounts plus all other relief the Court deems just.

RESPECTFULLY SUBMITTED this 16th day of April, 2020.

BARRY KIRSCHNER LAW, LLC


By      /s/ Barry Kirschner  #005592
         Barry Kirschner
         Barry Kirschner Law, LLC
         2205 E. Speedway Blvd.
         Tucson, AZ 85719
         520-849-7771
         Fax: 520-849-7773
         *Attorney for Plaintiff*